WEST VIRGINIA COAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 14790. Promulgated May 3, 1929.

*H. Kennedy McCook, Esq.*, and *George R. Davis, Esq.*, for the petitioner.

*James A. O'Callaghan, Esq.*, for the respondent.

382

OPINION.

ARUNDELL: One of the allegations of error is that respondent failed to adjust invested capital as the result of a refund of income and profits taxes for 1917 in the amount of $3,642.54. No facts were alleged or proved with respect to this item. The respondent's determination in this particular must therefore be sustained.

There remains for disposition the question of the proper adjustments to be made in invested capital as the result of the acquisition of the Elmo Mining Co. stock and the subsequent exchange of that stock and of other assets for the Stone Cliff Coal & Coke properties, and the amount of depletion and depreciation to which petitioner is entitled because of its ownership of the lease and operation of these properties in 1918.

Petitioner, in October, 1917, acquired for 1,250 shares of its capital stock all the capital stock of the Elmo Mining Co. This stock, the evidence establishes, had a value of $125,000. After acquiring the stock petitioner paid off an indebtedness of the Elmo Mining Co. in the amount of $35,000. In the same year, 1917, petitioner acquired from the Stone Cliff Coal & Coke Co. the coal lease under which that company was then operating, together with the plant and equipment on the leased property. What was paid for this lease is a question on which there is a conflict of testimony. Under date of November 20, 1917, petitioner entered into an agreement with Thomas C. Beury whereby it agreed to sell to Beury the Elmo Mining Co. stock for $125,000 cash. On the same date the petitioner entered into an agreement with the Stone Cliff Coal & Coke Co., of which Beury was president and majority stockholder, whereby petitioner agreed to buy from the Stone Cliff Co. all of the latter's assets for $162,500 cash. These agreements, it was testified by officers of petitioner and by Beury, were never carried out and for that reason we have not incorporated them in our findings of fact. Beury's testimony as to how the transaction was carried out is that petitioner issued a check to the Stone Cliff Coal & Coke Co. in the amount of $37,500 in full payment for the lease, which check he, as president of the company, endorsed and handed back and the amount was credited to his personal indebtedness on petitioner's books; that petitioner advanced funds to him to secure the release of the $50,000 face value of Stone

Cliff Coal & Coke Co. bonds which were then held by a bank as security for a note of Beury's, and that upon his obtaining the release of the bonds he turned them over to petitioner in exchange for the 500 shares of Elmo Mining Co. stock.

Petitioner's officers testified differently. They say that no check for $37,500 was issued payable to either Beury or the Stone Cliff Coal & Coke Co. in either 1917 or 1918; that they acquired the Stone Cliff lease and plant for the Elmo Mining Co. stock plus the $37,500 credit to Beury; that they had been informed and believed that the Stone Cliff bonds had never been issued by the company and they insisted on the delivery of the bonds to prevent their falling into the hands of innocent purchasers.

We find it difficult to give full credence to Beury's version of the transaction. It does not seem likely that the petitioner would advance funds to secure the release of the $50,000 Stone Cliff bonds and then give in exchange for them the Elmo Mining stock, which was worth at least $125,000. And it hardly seems possible that Beury, a practical operator who knew the value of the Stone Cliff lease, would sell for a credit of $37,500 the lease and plant and equipment.

The gist of the transaction, as we gather it from the conflicting views of the witnesses, was this: Petitioner owned all the stock of the Elmo Mining Co., which at the time it was paid in to petitioner was worth $125,000. This stock, plus a credit of $37,500 against what Beury owed petitioner, was traded in 1917 for the lease and physical property of the Stone Cliff Coal & Coke Co., the property acquired having an actual cash value of $162,500.

How should petitioner's invested capital reflect this transaction which took place in December, 1917? We have found the value of the Elmo Mining Co. stock at the time paid for petitioner's stock to be $125,000. The substitution of some other item of property for that paid in for stock would not affect petitioner's invested capital, except as there might be an adjustment as to inadmissibles and of surplus because of gain or loss on the exchange. The Commissioner has allowed as an item to be included in invested capital after the exchange of properties, the amount of $35,000 which was paid upon the indebtedness of the Elmo Mining Co. after the petitioner acquired its stock, plus an amount of $37,500 credited to Beury upon the exchange of properties in December, 1917. He has disallowed any value for the Elmo stock as of the date of acquisition for petitioner's stock, which, as stated above, we have found to be $125,000. If there had been no exchange of property with the Stone Cliff Co., and disregarding for the time being any question of affiliation, then by reason of our findings petitioner's invested capital would be increased $125,000 over the amount allowed by respondent, subject

to any necessary adjustment for inadmissibles. Petitioner, however, has exchanged for properties of the Stone Cliff Co. having a fair market value of $162,500 at the time of the exchange 500 shares of Elmo Mining Co. stock, and has canceled an indebtedness due it by Beury in the amount of $37,500. It has therefore substituted for assets reflected in its invested capital at $197,500, assets of the value of $162,500. This transaction serves to reduce petitioner's earned surplus by $35,000. It follows that in the computation of petitioner's invested capital as of the beginning of 1918 the sum of $162,500 should be used in place of the $72,500 used by respondent in his determination.

We have found that the entire cost of the Stone Cliff properties was $162,500, and of this cost petitioner in its valuation schedule attributed $120,000 to the cost of the lease and $34,101.24 to the plant and equipment, the balance being assigned to store merchandise. We see no reason, on the evidence, for disturbing these allocations, and they should serve as a basis in determining petitioner's depletion and depreciation. There is no evidence to indicate that the plant and equipment had a period of useful life longer or shorter than the coal supply and it is accordingly our opinion that deductions for the exhaustion of this property should be computed on the same basis as those for depletion of the coal reserve. The cost for computations of depletion and depreciation, is, therefore, $154,101.24. The evidence is that at the time the Stone Cliff properties were acquired there was an estimated reserve of 1,000,000 tons of coal. Efforts made during 1918 to drive through the fault to the reserve beyond it disclosed it to be of greater extent than it was originally believed to be, and upon the discovery being made the estimate of recoverable coal was reduced to 600,000 tons. Both of these estimates were made by an engineer of many years experience in that field, and it is our opinion that the "reasonable allowance" for depletion should be based on the revised estimated reserve of 600,000 tons.

In the valuation schedule filed the estimated recoverable coal was put at 300,000 tons, but this figure is not supported by the evidence. While the petitioner did not reach the coal beyond the fault, there is no evidence to show that it did not exist or that it could not be reached by an opening on some other part of the property. In fact, it appears that further efforts to reach the reserve beyond the fault were abandoned largely because of the drop in the demand for coal at the end of 1918.

Our finding of a cash value of $162,500 for certain assets, in lieu of a value of $72,500 determined by the Commissioner, may affect the matter of abnormalities under section 327 and computation of the petitioner's profits tax for the taxable year under the provisions

of section 328 of the Revenue Act of 1918 as was done by the Commissioner in his deficiency notice. In any event, the income and profits tax will be affected by a change in depreciation and depletion. It is directed, therefore, that prior to further consideration of the proceeding upon assignment of error (d) as to the proper rate of profits tax, the Commissioner give consideration to the determination of the Board herein and that he file with the Board a recomputation of the tax liability for the taxable year.

*Further proceedings will be had under Rule 62 (d).*