William Louis Albritton, et al. [1] v. Commissioner. Albritton v. Commissioner
Docket Nos. 46246-46248, 50377-50379.
United States Tax Court
T.C. Memo 1961-297; 1961 Tax Ct. Memo LEXIS 52; 20 T.C.M. (CCH) 1537; T.C.M. (RIA) 61297; October 27, 1961
*52 B. B. Taylor, Jr., Esq., for the petitioners. David E. Mills, Esq., for the respondent. OPPER
Memorandum Opinion OPPER, Judge: These consolidated cases are before us on mandate from the United States Court of Appeals for the Fifth Circuit issued pursuant to that Court's opinion in Albritton v. Commissioner, 248 F. 2d 49 (1957). The appellate court affirmed the Tax Court's finding of ordinary income in William Louis Albritton, et al., 24 T.C. 903 (1955), but remanded the case to us to hear "the question of depletion and [determine] the character and amount of depletion to which the taxpayers are entitled." 248 F. 2d 49, 52. Pursuant to the mandate, additional evidence on this issue was presented at a further hearing. In 1923 Alvin Albritton, hereinafter called Alvin, purchased 940.85 acres of farm land in the fifth ward of the parish of East Baton Rouge, Louisiana, hereinafter called the property. The stated consideration for the property was payment of $1 and the assumption of mortgages of $5,500 and $4,000 and the liability for the taxes due on the property for the year 1923. The property was originally purchased for use *53 as a cattle ranch and cattle have been pastured there continuously since the original purchase. The property was community property owned by Alvin and his wife until his wife died in 1937. At that time petitioners William Louis Albritton, hereinafter sometimes called William, and A. Stirling Albritton, hereinafter sometimes called Stirling, Alvin's sons, each inherited one-half of their mother's interest in the property. Alvin died on December 3, 1957. He left his estate to his four grandchildren, Mary Louise Albritton and Carol Stuart Albritton, the children of William, and Alvin Hughes Albritton and Michael Stirling Albritton, the children of Stirling. Sand and gravel were first discovered on the property in the middle 1930's. In exchange for a royalty interest of 5 cents a yard, a man named Irwin obtained permission to "hand screen" an exposed gravel bar on the Amite River, a river running through the property. Irwin moved a few hundred dollars worth of gavel by this "hand screening" and later put in a small pump and pumped for several months. There have been a number of operations along the Amite River for extracting sand and gravel throughout the years. William was experienced *54 in the commercial extraction of sand and gravel and represented the co-owners of the property in all business dealings. He was discharged from the Navy in December 1945. After his return he discovered that for 2 or 3 years Fletcher and Williams, operating under the name of the Louisiana Sand & Gravel Company, had been excavating substantial gravel from a portion of the property near or adjacent to the Amite River, hereinafter called the river pit. On July 9, 1946, a week to 10 days after he first learned of these operations, William instituted an injunction suit against Fletcher and Williams to restrain further extraction. A later suit, on June 29, 1947, was filed to determine the title to the property. Petitioners were successful in both suits and received $900 in damages. The river pit was leased thereafter to J. W. Carruth for purposes of extracting the gravel and sand. Some time after July 1946 but before December 1946, William discovered a second commercial deposit of sand and gravel, hereinafter called the inland pit. There had been some surface evidence of an extensive deposit. A surface exposure of 10 to 12 square feet had yielded a few wagon loads of sand and gravel for *55 use on the property. A few weeks after determining that a sizable quantity of gravel was present, petitioners leased the property to the Anderson Dunham Concrete Company. This company proceeded to do further exploration and established a commercial extraction there. The inland pit was 1/4 to 1/2 mile from the river pit. The inland pit did not yield as great an amount as was anticipated and the river pit had been substantially mined out before petitioners received full control. The actual receipts from the sale of sand and gravel are shown by the following schedules: Sand
Gravel
Year
Yards
Amount
Yards
Amount
Total
1948
57,874
$ 4,977.18
64,471
$ 7,465.77
$12,442.95
1949
103,555
8,905.74
115,359
13,358.60
* 22,264.34
1950
34,283
2,948.40
38,192
4,422.61
7,371.01
1951
3,475
298.84
3,871
448.26
747.10
1952
1,566
134.68
1,745
202.02
336.70
200,753
$17,264.84
223,638
$25,879.26
$43,162.10
1948
1949
River pit
$ 5,934.57
$ 1,116.35
Inland pit
6,508.38
20,247.99
$12,442.95
* $21,364.34
At present the deposits are fully depleted. *56 The inland pit and river pit are not part of the same mine, nor are they extensions of any known mine. The fair market value of the two pits was, at the date of discovery, $40,000. The Court of Appeals having sustained our determination that petitioners' transaction was a lease and not a sale, and respondent having now conceded for purposes of this case that petitioners' sand and gravel deposit was a mine and that petitioners are entitled to depletion thereon, the sole questions, which are largely factual, are the type and amount of depletion allowable. While the "basis" of the property for the purpose of computing discovery value, section 114(b)(2) of the 1939 Code, has been found by us as a fact, it does not follow that petitioners' claim for the maximum depletion allowance of 50 percent of the income from the property, section 114(b)(2), supra, can be sustained. Nor is the fair market value to be arrived at merely by multiplying the number of units of recoverable mineral by a price per unit. Dunn & Baker, Inc., 30 B.T.A. 663 (1934), affirmed per curiam 80 F. 2d 1010 (C.A. 9, 1936). "Fair market value" is the price for the property which a willing *57 buyer would pay a willing seller, considering here, among other things, the period of time over which income would be realized, the extent to which it is assured, and possible future changes. Reserve Natural Gas Co. of Louisiana, 12 B.T.A. 219 (1928); sec. 29.23(m)-7(a) and (b), Regs. 111. Although evidence is meager, we have incorporated herein our conclusion as to the fair market value of the mineral deposits within 30 days of discovery as required by the statute and regulations. H. M. Holloway, Inc., 21 T.C. 40 (1953). This amount is recoverable by petitioners over the life of the property, which has also been shown, West Virginia Coal Co., 16 B.T.A. 378 (1929); Kehota Mining Co., 3 B.T.A. 885 (1926), in amounts which may not in any year exceed 50 percent of the income from the property. The facts upon which such a computation may be made appear in the record and the parties should attempt to submit an agreed figure for the 2 years before us. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: A. Stirling Albritton and Ruth T. Albritton, Docket No. 46247; William Louis Albritton and A. Stirling Albritton as usufructuaries and as trustees for the minors, Mary Louise Albritton, Carol Stuart Albritton, Alvin Hughes Albritton and Michael Stirling Albritton, naked owners, and Quilla D. Albritton Dilworth (in place of Alvin R. Albritton, now deceased, and Quilla Albritton Dilworth), Docket No. 46248; William Louis Albritton, Docket No. 50377; William Louis Albritton and A. Stirling Albritton, as usufructuaries and as trustees for the minors, Mary Louise Albritton, Carol Stuart Albritton, Alvin Hughes Albritton and Michael Stirling Albritton, naked owners, and Quilla D. Albritton Dilworth (in place of Alvin R. Albritton, now deceased, and Quilla D. Albritton Dilworth), Docket No. 50378; and A. Stirling Albritton and Ruth T. Albritton, Docket No. 50379.↩
*. The discrepancy is not explained.↩